McBRIDE, Judge.
This is an action sounding in tort brought by Beatrice Falmer Sumlin, the mother and natural tutrix of Helen Sumlin, individually in her own behalf and also on behalf of said child, for the aggregate sum of $64,150, for damages arising out of an accident which happened about 10:30 a.m., on April 20, 1954, on Senate Street near Alfred Street, within the confines of the St. Bernard Housing Project in New Orleans, when said child, a pedestrian, was struck by a 1950 Ford dump truck. Impleaded as defendants in solido are the driver of the truck, its owner, and the liability insurer of the vehicle.
*110 Senate Street, which runs east-west, has a paved roadway 26 feet wide and accommodates a two-way traffic movement; Alfred Street, which runs at a right angle, terminates as it meets Senate Street from a northerly direction.
The truck was being driven westerly on Senate Street by Frank Monroe at a rate of speed which we are convinced was not more than 20 miles per hour, the allegation of plaintiff that it was speeding notwithstanding. The left side of the front bumper on the vehicle struck Helen Sumlin, four years old, as the child was in the process of crossing Senate Street from the south side thereof to the opposite side. Everyone agrees that the child attempted to cross the street from behind a bus which was stopped to take on passengers.
There is no dispute that on the morning in question Helen Sumlin, accompanied by Ethel Carmouche and Josie Anderson, aged IS and 13 respectively, left the premises 4131 St. Bernard Avenue, situated in the housing project, to proceed on foot to Senate Street, the two older children intending to board the “nickel” bus which would take them to Paris Avenue where they could board a bus of the New Orleans Public Service which would take them to their ultimate destination. It might be stated that the shuttle bus is privately operated within the St. Bernard Housing Project, where there are no established bus lines, and serves to carry the residents of the project to and from the transportation facilities located on St. Bernard and Paris Avenues. The child, Helen Sumlin, was bound for a sweet shop which is located on Alfred Street near Senate. In order to take the bus, the two older girls would not have to cross Senate Street, but to reach the store the small child would have to negotiate such a crossing.
When the trio reached Senate Street at a point just about opposite where Alfred Street meets it on the other side, the shuttle bus approached them from the direction of St. Bernard Avenue, and upon one of the older girls hailing it, the bus was brought to a stop closely paralleling the curbing on Senate Street. The front end of the vehicle was about 7 or 8 feet from what would have been Alfred Street had said street intersected Senate Street.
Ethel Carmouche entered the bus via the front entrance, while Josie Anderson took four-year-old Helen Sumlin by the hand in order to assist the child to cross to the opposite side of Senate Street. They entered the roadway about 7 feet behind the rear of the bus, and Josie Anderson led Helen to the center of the street, then let go of her hand instructing the child to continue onward and complete the crossing. Josie Anderson explained that she feared the bus would not wait for her and that she left the child in the street believing it safe to do so. She stated that before leaving the little girl, she looked both ways on Senate Street for approaching traffic and saw hone. Josie retraced her steps to the sidewalk, then proceeded to the front door of the bus, and as she placed one foot on the step she screamed. The damp truck which struck the child approached from the front of the bus, and although varying distances are mentioned by the witnesses, we are reasonably sure the accident happened about 42 feet after the truck passed Alfred Street. There is no question that the child was about the middle of the street at the time the truck hit her. The record shows conclusively that the truck skidded a distance of 34 feet 4 inches and the rear wheels of the vehicle came to a stop at exactly the point where the skid marks ended.
The plaintiff charges the driver of the truck with eight specifications of negligence, but we do not deem it necessary to detail them in this opinion. The defense is that the young child, who was in the care of Josie Anderson, darted out from behind the parked bus immediately into the path of the oncoming truck and was struck when she had traversed approximately 2% feet from the side of the bus. Defendants deny any negligence on the part of the truck driver, and it is contended by them *111 he applied his brakes as soon as he sensed the sudden emergency created by the child and brought his truck to a stop as quickly as human reactions and mechanical brakes would permit.
After a trial on the merits, there was judgment in favor of defendants dismissing the suit. The reasons for judgment assigned by the lower court read as follows:
“The Court rendered its judgment in this matter in favor of the Defendants dismissing the suit of Plaintiff for the reason that it found from all evidence adduced at the trial that this accident did not occur through the negligence of any one of the defendants or their agents or employees, but that the minor child, Helen Sumlin, was injured because of the negligence of the persons who stood in loco parentis to her at the time that this accident occurred.”
Plaintiff has taken this appeal from the judgment.
Josie Anderson saw no vehicles approaching as she parted company with the child in the roadway, and plaintiff’s theory of necessity must be that the child remained where she was left for the period of time it took Josie Anderson to reach the front door of the 28-foot-long bus and long enough for the truck to turn into Senate Street from Jumonville Street, a block away, then traverse the block and run the child down.
After Josie Anderson left the child, neither she nor Ethel Carmouche again saw her before the accident, and their statements that Helen was in the position in which she was left when run down by the truck are based on an assumption. Their testimony as to what actually happened is of no value.
Martin White, the operator of the bus, says he saw the truck when it turned into Senate Street from Jumonville. He claims he knew Monroe, the truck driver, and that they waved and called to each other as the truck was passing the bus. White’s testimony when carefully analyzed throws much light on what transpired immediately before the accident. He states his bus is equipped with two mirrors, one being the rearview mirror located over the driver’s head inside the bus, and the other being a protruding side-view mirror on the left-hand or driver’s side on the front of the vehicle.
It is significant that White stated that between the time he first saw the truck and the time he waved at Monroe he saw the little girl “back of the bus.” He follows this statement with the assertion that when it appeared the truck was going to hit the child, she had come into range of his side-view mirror. We quote White’s testimony verbatim:
“Q. Understood you to say you first saw the little girl through the .rear view mirror? A. Yes.
“Q. When you first saw her through the rear view mirror — A. Yes, sir, when I first—
“Q. —do you, when you first saw her through the rear view mirror, do you recall where the truck was with regard to distance from .you? A. No, I don’t know where the truck was at that time; I didn’t know where the truck was direct, because I first seen it at the first beginning down at Ju-monville. When I seen him again, he was right there, and he hollered at me and waved.
“Q. All right, between those two times, when you said you noticed the . truck, between those two times, did you see the little girl in the street? A. The little girl was back of the bus; I seen the little girl—
“Q. From the middle mirror or— A. The middle glass.
******
“Q. Was that the time when you saw her through your rear view or *112 side view mirror as you call it? A. The middle mirror.
“Q. After you first saw the truck down the street? A. Yes, that’s when I first saw him.
* * * * * *
"Q." Did the little girl come into view of your rear view mirror again between that time and the time that you ascertained that the truck was going to hit the girl? A. No, she came in view of my — of my side view mirror then.”
We can only take Josie Anderson’s word for it that she left the child when it was half way across the street, but White’s testimony makes it certain the child did not remain in the middle of the roadway but turned and took a position behind the bus. White’s glance into the rearview mirror took place after the truck had turned into Senate Street, and of a certainty this must have been subsequent to the time Josie Anderson left the child in the street because Josie said there was then no oncoming truck in sight. White did not see the child in the middle of the street until she came into the range of view of the side mirror at which time the truck was almost upon her. This unmistakably demonstrates the child proceeded from behind the bus and emerged out into the roadway just as the truck was close upon her.
The quoted testimony of White essentially corroborates Monroe who drove the truck. Monroe declares that when his truck was about 21 feet before reaching Alfred Street, he slowed down almost to a stop in order to permit an automobile to pass between the bus which was to Monroe’s left and a car parked on the opposite side of Senate Street. He was familiar with the bus and the fact that it carried passengers from the housing project to the regular bus line because he himself rode the bus from time to time. After the automobile passed between the bus and the parked cars, Monroe continued his forward course, crossed Alfred Street, and after passing part of the bus, he saw what he termed a “flash” coming from immediately behind that vehicle. The sides of the two vehicles were separated by a distance of only 2% feet because it was necessary, in view of the parked vehicles, for the truck to travel just to the right of the center of the street. Met with this emergency which was presented when the “flash” emerged from behind the bus, Monroe states he applied his brakes immediately and brought the truck to a stop within the distance of a few feet, and even before it had completely passed the bus. The injured child was found under the cab of the truck. There are some minor and unimportant discrepancies in Monroe’s testimony, but these need not be discussed. Monroe is an illiterate man and we are inclined to the belief that this fact accounts for the inconsistencies, but, at any rate, we can find nothing which detracts from his apparent honesty and sincerity.
The trial judge accepted Monroe’s version as to what happened, and predicated his judgment thereon. This is a case which involves solely a question of fact, and we fail to find any fault with the findings of our brother below. Certainly we do not perceive any manifest error.
We cannot for one moment doubt that Helen Sumlin suddenly and without warning darted from a position behind the bus out into the street directly in the path of the oncoming truck, and that the truck driver was afforded no opportunity of stopping in time to avert injuring the child. He did all he could to prevent such injury as is attested to by the skid marks left by the rear wheels of the vehicle. The accident was one which must be considered unavoidable insofar as the truck driver is concerned and the defendants cannot be *113 held in damages. Hebert v. Meibaum, 209 La. 156, 24 So.2d 297; Henderson v. Percy, 182 La. 953, 162 So. 739; Basham v. Ohio Casualty Insurance Company, La.App., 106 So.2d 129; Hurst v. Cambre, La.App., 52 So.2d 725; Bailey v. Reggie, La.App., 22 So.2d 698.
Appellant raised another point in argument before us which we think should be briefly discussed. She contends that Monroe was negligent in driving his truck at the speed at which it was traveling, even though such speed was within the legal limit, because the bus was clearly marked “school bus” and the fact that it was a school bus that was stopped for the purpose of taking on passengers should have brought home to Monroe there would likely be children in the vicinity and he should have used extraordinary care and caution in approaching and passing the bus.
On the day in question the regular bus used to shuttle the passengers in the housing project was out of working order and the owner of the shuttle service borrowed a school bus from St. Monica School for temporary use. The word “school” was on the front and back ends of the vehicle, but there were also signs showing its use for the benefit of the residents of the housing project.
We do not think the vehicle should be placed in the category of a “school bus” or that Monroe could be held to the legal duties he might have owed had the vehicle been used at the time to transport school children. The bus cannot be deemed a “school bus” within the contemplation of the law.
Appellant also contends that her case was materially prejudiced by the fact that the trial judge refused to allow her to place Monroe on the witness stand as for cross-examination under LSA-R.S. 13:-3662. The transcript of evidence reveals that Monroe had moved from a former address, and defendants’ counsel did not subpoena him as a witness because they did not know of his whereabouts. Plaintiff was cognizant of this, but was content to proceed with her case knowing that she could not place Monroe on the stand as for cross-examination. Monroe’s address was ultimately ascertained and he was duly summoned to appear. Meanwhile, plaintiff had rested her case, and when the matter was refixed for the taking of defendants’ evidence, plaintiff requested the judge to reopen her case so she could examine Monroe under the statutory provisions. The court made the following ruling:
“Counsel asks that the case be reopened in order to permit the defendant to go on the stand. He opened his case the other day and closed it the other day, and didn’t even want the evidence of this particular witness. The witness was not present in Court. It’s been an illy tried lawsuit, and the Court refuses at the present time to open it. The witness, if the Court understands, will be placed on the stand, by the Defendant, and counsel for the plaintiff can cross examine him then.”
The judge also made this remark to counsel for defendants:
' The judge also made this remark to counsel for defendants:
“ * * * if you don’t put him on the stand, then I am going to permit him to put him on the stand.”
There is no error in the ruling. We fail to see how plaintiff’s interest was jeopardized as her counsel put Monroe through a thorough cross-examination after he hai\ testified on direct examination.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
REGAN, J., absent.